**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND,**
**NORTHERN DIVISION**

CANDACE LOVETT; EDWARD LOVETT; REGINA ROLAND; C.C., R.R., and R.H., minors, by and through their next friend Mary Smith; *on behalf of themselves and all others similarly situated*,

*Plaintiffs*,

v.

BALTIMORE CITY DEPARTMENT OF SOCIAL SERVICES
2000 North Broadway
Baltimore, Maryland 21213

BRANDI L. STOCKSDALE, *in her personal capacity and in her official capacity as Director of the Baltimore City Department of Social Services*
2000 North Broadway
Baltimore, Maryland 21213

AUDREY J. S. CARRIÓN, *in her personal capacity and in her official capacity as Circuit Administrative Judge and Chief Judge*
111 North Calvert Street
Baltimore, Maryland 21202

CHARLES M. BLOMQUIST, *in his personal capacity and in his official capacity as Judge-in-Charge of the Juvenile Division*
300 North Gay Street
Baltimore, Maryland 21202

PATRICIA BROWN, *in her personal capacity and in her official capacity as Magistrate for Juvenile Causes*
300 North Gay Street
Baltimore, Maryland 21202

Case No. ____________
**REDACTED**

**CLASS-ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

NEETA KATARIA, *in her personal capacity and in her official capacity as Magistrate for Juvenile Causes*
300 North Gay Street
Baltimore, Maryland 21202

WILLIAM GYAUCH, *in his personal capacity and in his official capacity as Magistrate for Juvenile Causes*
300 North Gay Street
Baltimore, Maryland 21202

RONALD GROVE, *in his personal capacity and in his official capacity as Magistrate for Juvenile Causes*
300 North Gay Street
Baltimore, Maryland 21202

KRISTIN PEACOCK, *in her personal capacity and in her official capacity as Magistrate for Juvenile Causes*
300 North Gay Street
Baltimore, Maryland 21202

ANISSA JAI BONNER, *in her personal capacity and in her official capacity as Magistrate for Juvenile Causes*
300 North Gay Street
Baltimore, Maryland 21202

RAVEN SMITH, *in her personal capacity and her official capacity as a caseworker for the Baltimore City Department of Social Services*
2000 North Broadway
Baltimore, Maryland 21213

ADENIYI AFOLABI, *in his personal capacity and his official capacity as a caseworker for the Baltimore City Department of Social Services*
2000 North Broadway
Baltimore, Maryland 21213,

*Defendants*.

## INTRODUCTION

1. In Baltimore City, when a report of alleged child neglect or abuse is made, the decision whether to seize a child from a parent is made solely by personnel within the Baltimore City Department of Social Services (BCDSS); no judge ever approves a child's removal before it happens. BCDSS conducts nearly all child removals in Baltimore City in this extrajudicial manner, regardless of whether such emergency action is needed to protect children.

2. Plaintiffs have experienced such seizures of their children personally. In February 2025, for example, Candace and Edward Lovett were at home with their 19-month-old son, H.L., when a BCDSS caseworker arrived with uniformed police officers and demanded entry. Although H.L. was healthy and well, the caseworker took him away from his parents—away from the only home he had ever known—and sent him to live with his aunt. It did so pursuant to an agency-dictated separation order, which the agency euphemistically calls a "safety plan," thereby bypassing the statutory process for removal. *

3. No hearing was held before this removal. No judge authorized the separation. And no emergency existed to justify the extrajudicial action. BCDSS took H.L. in part because [redacted]. H.L. was taken even though the Lovetts were in the process of moving, which largely would have addressed the issues that BCDSS identified.

* To protect the identities of plaintiffs and their families, the parent plaintiffs and next friend use pseudonyms and any children are referenced using initials. A motion for leave to proceed in this way is being filed contemporaneously.

4. Four weeks later, with nothing changed, BCDSS belatedly declared an "emergency" and formally took both H.L. and the couple's newborn son, D.L., into state custody—again without judicial approval.

5. Today, both boys remain in state custody and have not been allowed to go home to their parents in almost two years, [redacted].

6. Ms. Lovett is currently pregnant, and the baby is due in January. Based on their experience with BCDSS (past and ongoing), the Lovetts live in fear of BCDSS taking their new baby without the basic process required by the United States Constitution.

7. Plaintiff Regina Roland and her three children also endured a devastating and traumatic forced separation by BCDSS. In fall 2025, after a false report by Ms. Roland's father, BCDSS informed her at a Zoom meeting that her children had to stay with him—a requirement Ms. Roland understood to be court ordered but was actually dictated by the agency via a "safety plan." BCDSS kept the family apart for nearly two months without any court involvement. When BCDSS finally went to court, a magistrate sent the children home but allowed the case to proceed. Months later, when BCDSS finally had to prove its allegations, the court dismissed the case.

8. Ms. Roland's children—plaintiffs C.C., R.R., and R.H.—are (like their mother) still suffering the effects of the removal and separation; the children continue to live in fear of future separation from their mother. As C.C., now nine, puts it: "I'm scared that someone will try to keep me and my sisters from being able to see my mom again whenever we want."

9. Ms. Roland, meanwhile, is currently pregnant and fears that her upcoming birth will precipitate yet another BCDSS investigation and the re-removal of her children. She fears

that hospital workers who are mandated reporters will refer her to BCDSS without justification, prompting an investigation and removal.

10. These families are not alone. Thousands of other Baltimore City families live under the same threat: a knock at the door from BCDSS and the extrajudicial seizure of their children, with no opportunity to meaningfully contest the separation for months or years after the removal.

11. The forcible and unexpected removal of a child from his or her home causes deep and long-lasting trauma, not only to the child but also to the child's parents and siblings—often resulting in devastating, life-long impacts.

12. BCDSS routinely inflicts those irreparable harms on children and their families by abusing its so-called "emergency" powers, adopting a policy and practice of taking children from their homes based on a supposed emergency in *every single case*, even though, in most cases, no emergency exists. Under that policy and practice—maintained by the agency's director, defendant Brandi Stocksdale—nearly all removals are made before any judge hears from the agency or the family, reviews evidence, or determines whether removal is warranted.

13. BCDSS conducts these extrajudicial removals even though there is typically plenty of time to provide notice and hold a hearing before removing a child from the home, without putting the child in danger. By falsely asserting in every case that an emergency justifies removal, BCDSS instead nearly always removes children without first filing a petition in court, without providing parents or children with a meaningful opportunity to be heard, and without seeking judicial authorization, even in the form of *ex parte* approval from a judge.

14. The illegality of this routine invocation of "emergency" authority is particularly clear given that most Baltimore City removals involve allegations of neglect where there is no imminent danger of severe or irremediable injury to a child and where alternatives are available to

mitigate potential harm. Most of the neglect allegations, moreover, concern the everyday realities faced by families living near or below the poverty line, or who are experiencing a temporary hardship. BCDSS, however, routinely treats a family's lack of resources and daily struggles as evidence of neglect warranting the immediate extrajudicial seizure of a child.

15. The neglect allegations that BCDSS often uses to justify emergency removal routinely lack support. For example, in Ms. Roland's case, [redacted] In the Lovetts' case, the agency [redacted] And in both cases, [redacted], even though, in reality, the children had been removed from the home days, weeks, or months prior.

16. An extrajudicial removal by BCDSS is just the beginning of the state's lengthy intervention in the family's life—and the painful family separation that results. After a child is seized, the separation almost always persists for weeks or months before there is a meaningful opportunity for parent and child to contest the removal. Although an initial hearing is supposed to occur within a day of removal, that hearing does not provide a genuine opportunity to challenge the removal or continued separation. The hearings are scheduled to last only minutes, there is no practical opportunity to put on witness testimony, and the rules of evidence do not apply. Parents typically are not permitted to speak except to state their names, and the seized children are usually not present. And any findings can rest on multiple levels of unreliable hearsay and factual proffers, with no meaningful opportunity to confront the witnesses behind the out-of-court statements.

17. After these initial hearings, BCDSS and judicial officers in Baltimore City continue to separate families when it is not necessary to do so. They do not find that continued separation is necessary to protect the child from severe injury, consider whether there are less-restrictive alternatives to removal that could address any genuine safety concerns, or whether the harms of removal are outweighed by the danger if the child remains in the home.

18. The widespread and prolonged separation of children from their parents causes lasting and devastating harms. Clinical research—as well as children's accounts of their experiences—establishes that separating a child from a parent is profoundly traumatic for the child, inflicting lasting harm regardless of the child's age or the length of the separation. As a result of their experiences, many children who are removed from their parents suffer higher rates of depression, suicide attempts, substance use, developmental delays, and involvement in the criminal legal system over their lifetimes compared to similarly situated children who remain at home. Foster placement, moreover, inflicts a further, distinct set of harms, including placement instability, separation from siblings, and abuse. And reunification after a family finally receives a meaningful court hearing does not undo these grievous injuries.

19. Parents suffer their own severe and often irreparable injuries. Studies document that parents experience grief, anxiety, and a loss of identity when their children are seized by the state, as well as a markedly elevated risk of death from suicide and other avoidable causes.

20. Plaintiffs therefore bring this action, pursuant to 42 U.S.C. §1983, on behalf of themselves and two classes subject to defendants' policies and practices.

21. The "Parents' Class" includes all parents whose children are or will be seized or otherwise separated from their parents by BCDSS.

22. The "Children's Class" includes all children who are or will be seized or otherwise separated from their parents by BCDSS.

23. Together, plaintiffs and the classes seek declaratory and injunctive relief to (1) end defendants' unconstitutional policy and practice of unnecessary family separation without basic pre-deprivation process or an emergency justifying evading judicial authorization, and (2) ensure that no child is removed and no family remains separated unless separation is found to be necessary following a hearing that comports with substantive and procedural due process. Plaintiffs and the classes also seek damages for the injuries sustained from defendants' policies and practices.

## PARTIES

### A. Plaintiffs

24. Candace and Edward Lovett are married and the parents of children H.L. and D.L., ages three and one. All four live in Baltimore City.

25. Regina Roland is the mother of C.C., R.R., and R.H. She lives with her children in Baltimore City.

26. C.C., R.R., and R.H. (the "Children Plaintiffs") are nine, six, and five years old, respectively. They live with their mother in Baltimore City.

27. Pursuant to Federal Rule of Civil Procedure 17(c)(2), C.C., R.R. and R.H. appear through their next friend, Mary Smith. Ms. Smith lives in Baltimore County, and she has been close friends with Ms. Roland for more than eight years. Ms. Smith has also known C.C. since he was a baby, and R.R. and R.H. since they were each born. Indeed, she regularly sees and cares for C.C., R.R., and R.H., approximately six times a month. Ms. Smith is closely familiar with the allegations relating to C.C., R.R., and R.H.'s removal from Ms. Roland's care, and further understands the responsibilities attendant to her role as a next friend in this case. She is willing

and able to represent C.C., R.R., and R.H. as well as the proposed Children's Class, is dedicated to their best interests, and has no conflict that would preclude representation.

**B. Defendants**

28. BCDSS is charged with investigating allegations of child neglect or abuse in Baltimore, seizing children and placing them in state custody, petitioning courts for an order to commit children to state custody, determining children's placements while in BCDSS custody, and determining visitation schedules for parents, children, and siblings in BCDSS custody as well as the nature of visitation (e.g., supervised or unsupervised, length, frequency). BCDSS has broad authority to make and implement policy—consistent with state and federal law—regarding how and when children are removed, what constitutes an "emergency" sufficient to seize a child without judicial involvement, when to petition for removal without invoking emergency powers, when to seek a court order authorizing child removal, and when to pursue alternatives to removal such as providing material support or in-home services to children and their families. BCDSS has authority to train and supervise its employees and caseworkers regarding constitutional practices.

29. Brandi L. Stocksdale is the director of BCDSS. As director, she has the same authority just described for BCDSS.

30. Audrey J. S. Carrión is the circuit administrative judge and chief judge of the Circuit Court for Baltimore City. In those roles, she is responsible for developing and implementing its case-management plans, which govern the scheduling and disposition of child-removal cases. Judge Carrión promulgates, enforces, and/or acquiesces in the unconstitutional policies and practices of the judges and magistrates who preside over child-removal cases.

31. Charles M. Blomquist is the judge-in-charge for the Juvenile Division of the Circuit Court for Baltimore City. In that role, he is responsible for implementing and monitoring its case-management plans, which govern the scheduling and disposition of child-removal cases. Judge

Blomquist promulgates, enforces, and/or acquiesces in the unconstitutional policies and practices of the judges and magistrates who preside over child-removal cases.

32. Patricia Brown, Neeta Kataria, William Gyauch, Ronald Grove, Kristin Peacock, and Anissa Jai Bonner are magistrates for juvenile cases in the Circuit Court for Baltimore City, appointed by the judges of that court. These defendants preside over proceedings in child-removal cases, and they apply the policies and practices established by defendants Carrión and Blomquist that are challenged in this action. Magistrates Brown, Kataria, Gyauch, Grove, Peacock, and Bonner either presided over one or more of the named plaintiffs' proceedings or may be assigned to future proceedings involving the plaintiffs.

33. Raven Smith is a BCDSS intake supervisor who supervised the investigation of the Lovett family. As an intake supervisor, Ms. Smith reviews and approves caseworkers' decisions to remove children without first seeking a court order. [redacted]

34. Adeniyi Afolabi is a BCDSS caseworker. He was responsible for removing C.C., R.R., and R.H. from Ms. Roland's custody [redacted] He also provided knowingly false statements that led to the state-custody order on November 26, 2025.

## JURISDICTION AND VENUE

35. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§1983 and 1988, and under 28 U.S.C. §§1331 and 1343(a), which provide for jurisdiction over all cases brought (as this one is) pursuant to the Constitution and laws of the United States.

36. This Court has supplemental jurisdiction over plaintiffs' state-law claims pursuant to 28 U.S.C. §1367.

37. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201-2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure. Plaintiffs' claims for damages are authorized by 42 U.S.C. §1983 and Maryland law. This Court has authority to award attorneys' fees and costs under 42 U.S.C. §1988.

38. Venue is proper in the District of Maryland pursuant to 28 U.S.C. §1391(b)-(c), as a substantial part of the acts and omissions complained of occurred in this district, and all plaintiffs reside in this district. Assignment to the Northern Division is appropriate under Local Rule 501.4, because BCDSS's principal office is located in Baltimore City, and all named plaintiffs reside there.

## FACTUAL ALLEGATIONS

### I. The Named Plaintiffs And Other Class Members Are Victims Of Baltimore's Unlawful Emergency Removal Policy

39. Each named plaintiff has experienced firsthand the unconstitutional policies and practices challenged in this action. Ms. Roland and Ms. Lovett are both pregnant, with Ms. Roland due in December and Ms. Lovett in January; each has concrete reasons, described below, to fear that BCDSS will separate their families again when their respective babies are born. And all plaintiffs fear the harm that would be inflicted by another unlawful separation, including the limited ability to touch, hold, and be in the presence of their children and parents.

#### A. Candace and Edward Lovett

40. The Lovetts' experience illustrates the unlawful policies challenged here. In summary: With the police but without a court order, BCDSS removed their toddler, H.L., from their home, largely because of [redacted]

[redacted], through an agency-dictated "safety plan." Four weeks later, with nothing changed, BCDSS declared an "emergency," formally took both of the couple's children into its custody, and [redacted] The purported emergency was based on an allegation that had no foundation—[redacted]—and that was later shown to be false. Despite this falsehood, BCDSS has kept the two very young children apart from their parents, with extremely limited contact, for well over a year. And even though a judge found [redacted] many months ago, to this day the boys have not come home.

41. BCDSS began the investigation which led to the children's removal in late January or early February 2025, after the agency received a report from [redacted]

42. The Lovetts' son D.L. was born prematurely on January 5, 2025, approximately 33 weeks into the pregnancy, and was immediately admitted to the NICU. He was later transferred to a different pediatric hospital for continued care.

43. Shortly after D.L.'s transfer, BCDSS received a report that [redacted] In reality, Mr. Lovett has a speech impediment that slurs his speech, and Ms. Lovett was simply exhausted (understandably so) from caring for both a toddler and a premature newborn. Both parents were also taking prescribed medications and were engaged in ongoing mental-health treatment. And the family lacked heat because their landlord refused to fix it; the Lovetts assured BCDSS that they and H.L. were always nonetheless safe and comfortable within the home.

44. On February 5, 2025, while D.L. remained in the hospital, BCDSS caseworker Dasia Coney came to the family's building and inspected the apartment with uniformed Baltimore

City police officers, telling the parents she would return for a follow-up visit. The caseworker then returned that evening, at the direction of BCDSS intake supervisor Raven Smith, again accompanied by police officers and this time Mr. Lovett's sister. The caseworker, at Ms. Smith's direction and approval, told the parents that, [redacted]

45. BCDSS carried out this removal via a so-called "safety plan" requiring [redacted]. The caseworker did not inform the Lovetts that they could refuse the "safety plan" or the removal, that they could place H.L. with a different family member, or even call a lawyer. Nor did the safety-plan form itself explain what a safety plan was or what rights the parents had. Ms. Lovett (crying uncontrollably) and Mr. Lovett signed the form because they were told to, even as they vehemently protested H.L.'s removal and asked how they could get him back. The Lovetts did not knowingly or voluntarily consent to the forcible removal of their child. BCDSS had no court order, and the agency—through the caseworker and her supervisor, Raven Smith—intentionally led the Lovetts to believe the separation was mandatory.

46. H.L. was a happy, healthy, and well-cared-for child when he was torn away from his parents. During the first nineteen months of his life, in his parents' care, he had never been injured or sick beyond what is normal for a child his age. Before BCDSS took him, he was, in his father's words, "a smiling, laughing, joyful baby," who was "loved, fed, and kept warm." BCDSS even noted on the day H.L. was taken that [redacted] Mr. Lovett's own therapist—who often saw H.L. at sessions—told BCDSS that [redacted] Family members said the same.

47. H.L.'s parents worked tirelessly to address BCDSS's stated concerns so that H.L. would be returned home quickly. Three weeks after the removal, they told a BCDSS caseworker they were moving, and they signed an updated agency-mandated separation order (i.e., safety plan). They did indeed move shortly thereafter—and when BCDSS inspected the new home (months later), it found that the [redacted]

48. Nonetheless, on March 3, 2025—four weeks after H.L. had been taken, while D.L. was still in the hospital—BCDSS declared an "emergency" and formally took both children into state custody. Nothing about their circumstances had changed during those four weeks: H.L. remained with his aunt under BCDSS's so-called safety plan, and D.L. remained in the hospital.

49. The Lovetts learned of this change in legal status the next day, March 4, when BCDSS filed a child in need of assistance, or "CINA" petition, identifying a single event as the supposed emergency: [redacted]

50. That allegation was false. [redacted]

51. In addition to that false allegation, the petition relied in part on [redacted] to support removal—but hid from the court the critical fact that [redacted], which BCDSS knew. The petition also omitted that [redacted] and that Mr. Lovett is [redacted]

52. The same day the CINA petition was filed, the Lovetts met their court-appointed attorneys for the first time and appeared by Zoom for an initial hearing—a full *month* after they had already been separated from H.L.. No witnesses testified and no evidence was offered. The Lovetts were given no opportunity to speak beyond stating their names. Magistrate Brown [redacted] and the supposed fact that [redacted] Magistrate Brown did not consider [redacted] Today, H.L. and D.L. remain in state custody, because the magistrate has repeatedly [redacted].

53. The Lovetts have done everything BCDSS and the magistrate have asked of them. They moved into a two-bedroom apartment—about which BCDSS, as noted, [redacted]. They have completed parenting classes, participated in substance-use and mental-health treatment, submitted to repeated drug tests, completed court-ordered mental health evaluations, and provided letters and records from their therapists and psychiatrists.

54. Despite BCDSS's and the magistrate's seemingly determined efforts to keep the family separated, the bond between the parents and their sons has endured. As Mr. Lovett testified in May 2026, when H.L. sees his father at a visit, he [redacted] Mr. Lovett explained,

and during that time, [redacted]

55. On July 23, 2026, the magistrate found that [redacted] by Ms. Lovett or Mr. Lovett, but still [redacted]

56. As the magistrate explained, [redacted] The magistrate then set the next review hearing for late January 2027, just days before Ms. Lovett's due date.

57. As of the filing of this complaint, H.L. has been separated from his parents for more than 650 days—over half his life. And D.L. has been in state custody for nearly his entire life and has never lived at home with his parents.

58. The Lovetts are terrified that BCDSS will take their new baby at the hospital, or soon after the baby comes home—just as it took H.L. and D.L. That fear is well founded: Their family remains under active BCDSS and court supervision, and the magistrate has said that [redacted] Moreover, Ms. Lovett takes prescribed controlled substances and has tested positive for other substances that would appear on the drug test hospitals administer at birth. A positive result will be reported to BCDSS and trigger an investigation. The ongoing agency involvement and heightened scrutiny they will face at birth puts the Lovetts at significant risk that BCDSS will remove their newborn baby and subject them to defendants' unconstitutional practices once again.

**B. Regina Roland, C.C., R.R., And R.H.**

59. Ms. Roland and her children were victims of the same unconstitutional removal policies and practices. In summary: Ms. Roland and her three children were unlawfully separated by BCDSS without notice, any judicial involvement, or a genuine emergency. When BCDSS

became involved, the children were staying with their grandfather, with Ms. Roland's knowledge and consent, while she arranged new housing. BCDSS turned that temporary arrangement into a mandatory separation, keeping it in place for nearly two months before bringing the matter to a court, which promptly ordered the children returned to her. She is now expecting another baby in December and fears that BCDSS will take that child at birth and her older children as well.

60. Ms. Roland has been her children's primary caregiver since each of them was born. Their life together is built on ordinary routines: She reads books with R.R. before bed, takes C.C. out to eat his favorite foods, and plays games with all three children. As C.C. puts it, "I love my mom, and I know that she will always protect me."

61. BCDSS has investigated Ms. Roland several times before. In two of those cases BCDSS removed her children, but her children were ultimately returned and the cases were closed. In 2020, for example, BCDSS removed C.C. on an emergency basis, with no prior court involvement; he was later returned to her care in 2021.

62. Then, in September 2025, Ms. Roland and her children were living with her father in Baltimore City. After a disagreement with her father, Ms. Roland moved out and stayed with her sister temporarily, while she arranged a new home for her family. While her children stayed at her father's house, she remained in close contact and engaged in their day-to-day care.

63. Around October 1, 2025, BCDSS contacted Ms. Roland and instructed her to attend a Zoom proceeding. Ms. Roland believed it was a court proceeding, but it was actually what BCDSS calls a "Family Team Decision Meeting" with BCDSS counsel and caseworkers. It was the first time Ms. Roland learned that BCDSS was again investigating her family. At that meeting, BCDSS [redacted]

[redacted]. No one told her that she could reject or contest that arrangement, or that she remained her children's legal custodian. Ms. Roland did not want to give her father custody or to have her time with her children restricted, but she understood the arrangement to be mandatory and that a judge had ordered it. Over two weeks later, BCDSS caseworker Mr. Afolabi met with Ms. Roland and told her to sign a form, which she did not understand, memorializing the "safety plan" BCDSS had unilaterally dictated.

64. BCDSS did not go to court prior to effectuating this removal. It had no court order for the change in the children's physical custody. And there was no emergency threatening the safety of her children that precluded seeking a court order.

65. By October 29, Ms. Roland had rented a three-bedroom apartment with room for all three of her children, and informed her caseworker that she had obtained housing.

66. For nearly two months, Ms. Roland saw her children only during visits arranged by family members. At the end of every visit, her children screamed and cried. C.C. remembers: "I missed my mom when she was away, and I was sad that I didn't know how she was doing and I couldn't see her whenever I wanted." R.R., then five, recalls that her mother "was not there when I was sick and throwing up." Every day apart, Ms. Roland missed being part of her children's daily lives, such as helping with homework and putting them to bed.

67. Although BCDSS knew that Ms. Roland had secured new housing, that her children were living at her father's house, and that she was in regular contact with them, on November 25, 2025, BCDSS falsely asserted that there was an emergency requiring it to seize the children, and took them into state custody that day. BCDSS did not seek any judicial approval beforehand.

68. The next morning, BCDSS held another "Family Team Decision Meeting" and informed Ms. Roland that there would be a court hearing that afternoon to address whether her children should remain living with Ms. Roland's father.

69. BCDSS's petition recited that [redacted] of Ms. Roland on November 25—even though, as the petition acknowledged elsewhere, [redacted] The petition also alleged that [redacted] even though she had obtained housing a month earlier; that [redacted] even though she had been sending money to her father for their care; and that [redacted], even though she had kept her caseworker informed of her regular visits with her children.

70. That afternoon, nearly two months after BCDSS had separated Ms. Roland from her children, Magistrate William Gyauch held the initial post-removal hearing by Zoom. At the urging of Ms. Roland's counsel and the direction of the magistrate, [redacted] Ms. Roland passed the housing inspection. BCDSS nonetheless asked that the magistrate [redacted] Ms. Roland's counsel objected and proffered that the allegations in the petition were [redacted] as shown by documentary exhibits.

71. The magistrate concluded that [redacted] (which improperly shifted the burden to Ms. Roland), [redacted] The magistrate's written order recited (contrary to all the evidence) that [redacted] and that [redacted] because of [redacted]—even as he sent the children home.

72. BCDSS, however, flouted the court's order, refusing to return the children home. Instead, BCDSS left them with Ms. Roland's father, who also refused to return the children to her. Ms. Roland had to threaten to call the police before her father finally returned them several days later. As a result, Ms. Roland missed spending Thanksgiving with her children.

73. The magistrate did not schedule an adjudication trial within 30 days as required by state law, instead scheduling an "adjudication settlement" hearing in December. At that hearing, BCDSS refused to dismiss the case, and Ms. Roland requested a trial to contest the allegations. The first available trial date was months later, keeping Ms. Roland's family under court and BCDSS supervision as she awaited a chance to contest the false allegations against her.

74. In February 2026, when BCDSS was *finally* required to prove its allegations in court, [redacted]. The magistrate found that [redacted]

75. Altogether, Ms. Roland was separated from her children for nearly two months without any opportunity to contest the separation before it occurred, and the case remained open—and the threat of continued separation loomed—for a total of five months.

76. That separation left lasting scars. For months after returning home, Ms. Roland's children were afraid to visit their grandfather's house alone because they feared they would not be allowed to come home. And C.C. is now in therapy to help him cope with the harm caused by the separation from his mother.

77. Ms. Roland, who is due to give birth in December, lives in constant fear that BCDSS will separate her family again. Her doctors advised her to stop taking her prescribed psychiatric medications during her pregnancy, but, struggling without them, she has used cannabis to manage her symptoms. Ms. Roland fears that she will test positive for cannabis when her baby is born, and she knows that such a positive test would trigger an invasive investigation by BCDSS into many details of her home and family life. Given her history with BCDSS, she fears that such an investigation will lead BCDSS to take her newborn and her older kids as well. She also worries that her children's school and medical providers, who know of her prior BCDSS involvement, scrutinize her more closely and would be quicker to report any perceived concern about her children as a result of that history.

78. C.C., R.R., and R.H. share that fear. As C.C. explains: "I'm worried when I go back to my grandfather's house that I will not be able to see or visit with my mom again for a long period of time." R.R. likes to see her grandfather, but, in her words, "I like living with my mom better. Living with my mom is two thumbs up!" Ms. Roland's upcoming delivery puts the children at real and immediate risk of another BCDSS investigation and of being separated from their mother again without notice, a hearing, or any genuine emergency.

## II. BCDSS Maintains An Unlawful Policy Of Unilaterally Seizing Children In Non-Emergency Circumstances

79. The named plaintiffs' experiences are illustrative of the flagrantly unconstitutional conduct in which defendants engage, day in and day out.

### A. BCDSS Subjects Families To Intrusive Investigations, Often Based On Unsupported Reports

80. Most families' initial involvement with BCDSS begins with a single phone call reporting a suspicion of abuse or neglect. The caller need not identify themselves or offer any evidence, so reports can be and often are used as instruments of retaliation—for example, by an ex-partner during a custody dispute, or by a relative or neighbor in a personal conflict. For many families, a call that a teacher or doctor believes will lead to a family receiving the help it needs will instead trigger an intrusive and stigmatizing investigation that results in children being torn away from their homes, parents, and siblings.

81. Any report can trigger an investigation of the family, which in Baltimore City is conducted by BCDSS caseworkers. *See* Md. Code Ann., Fam. Law §5-706(b), (c).

82. Caseworkers typically search the family's home without a warrant (and with any "consent" obtained only under threat of removal) and question parents about their and their children's mental and behavioral health. They also obtain confidential medical and educational records, interview children apart from their parents, and question the family's friends, relatives, neighbors, teachers, and doctors.

83. Throughout the investigation, parents understand that their "cooperation" is not optional: Refusing a caseworker's demands risks having their children taken. Parents investigated by BCDSS report feeling terrified and unsure what rights they have, if any. They face intense scrutiny of their every action, and scramble to prove that they are loving and capable parents.

84. Children who are old enough to understand what is taking place likewise experience significant stress and trauma from investigations, often describing fear—especially of being taken from their homes—along with anxiety, confusion, helplessness, loss of control, and worry for their parents and any siblings.

85. Although an investigation is supposed to include "a determination of any needed services," Md. Code Ann., Fam. Law §5-706(d), parents under investigation are more often handed a list of demands—to enroll in mental-health treatment, submit to substance-use screening, and/or obtain medical records—all on tight deadlines, while also caring for their children, working, perhaps recovering from childbirth, and otherwise keeping their households running. If a parent cannot comply quickly enough, BCDSS may deem that reason enough to take her children.

86. At any point during an investigation, BCDSS caseworkers can and often do decide to take a child from the parents and the home. Whether a child is taken rests largely on the judgment of individual caseworkers and their supervisors: Although BCDSS directs caseworkers to complete two checklists as part of a removal determination—the Maryland Safety Assessment for Every Child (SAFE-C) and the Maryland Family Risk Assessment (MFRA)—these checklists consist largely of vague, subjective, and conclusory criteria. They neither meaningfully direct nor meaningfully constrain BCDSS's removal decisions. Moreover, BCDSS fails even to complete these forms at the time of removal in most cases. For example, [redacted]

### B. BCDSS Removes Children Without Notice And A Hearing, Or Any Emergency Justifying The Immediate Removal

87. The Fourth and Fourteenth Amendments to the U.S. Constitution as well as Articles 24 and 26 of the Maryland Declaration of Rights require the government to obtain judicial authorization prior to seizing and removing a child except in an emergency, meaning that there is an "imminent danger of severe or irremediable injury to the child's health (and prior judicial authorization is not immediately obtainable)." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994).

88. BCDSS, however, has adopted a policy and practice of removing children without first seeking judicial authorization, regardless of whether the child faces an imminent danger of severe or irremediable injury that leaves no time to do so.

89. Nothing in Maryland law requires BCDSS to remove children from their families in this way. Maryland law uses the term "shelter care" to denote the state's temporary custody of a child pending an adjudicatory hearing on the merits of the allegations of abuse or neglect in the petition, providing "interim protection for a child who may be at risk in the home while the CINA petition is pending." *In re O.P.*, 470 Md. 225, 237 (2020). And state law permits BCDSS to place a child in "shelter care" without judicial involvement only to protect the child from "serious immediate danger," Md. Code Ann., Cts. & Jud. Proc. §3-815(b), and even then only if "[t]here is no parent, guardian, custodian, relative, or other person able to provide supervision," and if either (i) the child's continued placement at home is contrary to the child's welfare and, "[b]ecause of an alleged emergency situation," removal is reasonable to provide for the child's safety, or (ii) reasonable efforts to prevent removal have been made and failed. *Id.*

90. BCDSS's policies and practices flout this law, with the agency routinely taking children without ever determining whether an emergency exists that would preclude an opportunity for notice and a hearing. BCDSS does not maintain a definition of "emergency" that caseworkers must apply, and caseworkers do not assess, before taking a child, whether the child faces a danger so severe and so immediate that there is no time to bring the matter to a judge. In many cases, BCDSS does not identify any emergency at all, or falsely and knowingly asserts there is an emergency when there plainly is not.

91. As already illustrated, BCDSS sometimes separates families without formally taking custody at all using an agency-dictated "safety plan." A "safety plan" is supposed to be

temporary and negotiated between BCDSS and parents to address purported safety concerns while the child remains home. A plan could include that a parent will engage in mental health treatment, ensure adequate supervision for a child, or enroll a child in school. Instead, BCDSS regularly uses safety plans to separate families—dictating that a child must leave the parents' home and live with a relative or family friend until BCDSS decides otherwise.

92. These separations are voluntary in name only. Parents almost never have a lawyer at this stage. BCDSS often tells parents, or leads them to believe, that if they do not agree to the plan, their children will be taken. The form used does not explain what a safety plan is or that parents may refuse it, and some parents lack the knowledge or literacy skills to understand what they are being asked to sign. Indeed, parents often testify at subsequent hearings that they felt coerced into signing a safety plan. Sometimes they believe that a judge has ordered the separation.

93. In cases where BCDSS initially removes a child from the home under the auspices of a safety plan, the separation has the same consequences for the parent and child as a formal removal. But because BCDSS does not take legal custody, it files no petition, no court reviews the separation, and the family has no hearing at which to contest it. Children can remain apart from their parents under a safety plan for days, weeks, or months.

94. As each named plaintiff's experience shows, a child in Baltimore City may thus be "removed" twice: first physically, when BCDSS imposes a safety plan, and later legally, when BCDSS declares an "emergency" and takes the child into formal state custody, usually without moving the child at all. Only that second removal is followed by a petition and a court hearing. BCDSS's petitions routinely then describe the child as having been "initially removed" the day before, even when the family has been separated for weeks. BCDSS's own delay in seeking formal removal belies any claim that it was justified by an actual emergency.

95. A separation imposed through a safety plan is a removal in everything but name. A parent's signature obtained under threat that BCDSS will otherwise take the child is not voluntary consent—particularly where BCDSS has no lawful basis to carry out that threat because no emergency existed that would have justified taking the child without a court order.

96. The named plaintiffs' experiences show how the "consent" for a safety plan is often obtained and how an emergency rarely exists. BCDSS imposed the Lovetts' plan with police officers present, and Ms. Roland accepted hers believing that a judge had ordered it. In both cases, BCDSS waited before declaring an "emergency" and going to court: four weeks for H.L. and D.L., and nearly two months for C.C., R.R., and R.H. At any point during those delays, BCDSS could have filed a petition and sought a hearing and court order before taking custody of the children, but it simply chose not to.

97. BCDSS has an obvious alternative to declaring every extrajudicial removal an emergency that would safeguard children while also protecting the children's and their parents' constitutional rights: BCDSS could file a CINA petition without requesting temporary emergency state custody, meaning the child remains at home or with another willing caregiver pending an adjudication of the petition's allegations, or BCDSS could file a CINA petition and simultaneously seek court approval for shelter care prior to removing the child. And if necessary, BCDSS could request those hearings on an expedited basis.

98. BCDSS's practice of taking nearly every child without first going to court is a choice made and maintained by BCDSS leadership, including Ms. Stocksdale, who as BCDSS director has the authority to set the agency's removal policies and practices. She has chosen not to require caseworkers, such as Ms. Smith and Mr. Afolabi, to seek judicial approval before taking a child, even when there is no genuine emergency.

99. The practices just discussed are attributable not only to BCDSS and its personnel. Defendants Carrión and Blomquist know that BCDSS takes nearly every child without any prior judicial involvement. Almost every CINA petition that comes before the Juvenile Division follows a removal that has already occurred, and the Juvenile Division's docket is built around that practice, with initial hearings scheduled within hours of the petitions BCDSS files. Judges Carrión and Blomquist have acquiesced in BCDSS's practice. They have the authority to establish procedures through which BCDSS can obtain a timely court order prior to removal, to require judicial officers to determine whether continued separation is necessary to protect the child from severe injury, and to ensure that families receive a prompt and meaningful hearing. They have not done so.

100. The judicial defendants further bless BCDSS's emergency-child-seizure policies and practices by approving continued state custody after extrajudicial seizures as a matter of course. In each named plaintiff's case, the court [redacted]

101. More broadly, under the policies established and maintained by Judges Carrión and Blomquist, Baltimore City Circuit Court judges and magistrates do not require BCDSS to produce evidence that continued separation is necessary to protect the child from severe injury. Even where judicial officers make a finding that a child is in danger (or an emergency exists), they simply credit BCDSS's *assertion* without requiring documentary or testimonial support, and without weighing the harms of separation against any danger of returning the child home.

### C. Defendants Could Provide Meaningful Process Before Removal Without Significant Administrative Burden

102. Providing additional procedural protections before removal would not impose a substantial administrative burden on BCDSS. In most cases, BCDSS already interviews witnesses,

visits the home, gathers records, and prepares a petition setting forth the factual allegations that supposedly justify removal. The procedural safeguards that plaintiffs seek would thus simply require defendants—save where a genuine emergency exists—to present the information they already collect to a judge and allow parents to present their case *before* removing a child.

103. Nor would these safeguards substantially burden courts. The courts already provide a hearing on the same day a CINA petition is filed; the only difference under the relief sought here would be that those petitions and hearings would occur *before* a child is seized rather than after. And where BCDSS believes a child is in imminent danger of severe or irremediable injury but there is still time to involve a court, it could seek *ex parte* authorization for removal based on the same information it later presents in support of state custody. Only where the danger is so immediate that there is no time even for that may BCDSS constitutionally act first and seek a prompt hearing afterward. But as explained, that is not remotely its practice.

104. Providing meaningful judicial review pre-removal would in fact likely lessen the burden on the courts and BCDSS. Earlier judicial scrutiny would prevent unnecessary removals, reducing the number of children placed into costly out-of-home care. It would avoid months of litigation concerning removals that never should have occurred and reduce the burden on the court. In many cases, defendants ultimately prepare the same petitions, present the same allegations, and appear before the same judges regardless. The principal difference is whether meaningful review occurs before the family is separated or only after the harm from a child being forcibly seized and taken from their home has already been inflicted.

### D. BCDSS's Removals Are Often Based Largely On Poverty-Related And Other Non-Emergency Allegations

105. Most BCDSS removals are based on poverty-related allegations rather than on abuse or other circumstances that might necessitate immediate removal without a court order.

106. In 2023, for example, at least three-quarters of the children BCDSS removed from their homes were not removed based on any allegation of physical or sexual abuse. Nearly two-thirds of removals involved allegations of "neglect," which generally relate to circumstances of poverty. One common such allegation is housing instability. BCDSS frequently makes housing instability a central allegation supporting an extrajudicial removal, including where a parent and child are staying with a friend or relative, a parent cannot supply a copy of a lease for current housing, the parent and child are currently staying in a hotel or shelter, or that a home lacks certain utilities. *See, e.g.*, *In re I.C.*, 2025 WL 1936858, at *3-4 (Md. App. Ct. July 15, 2025). Even *past* housing instability is sometimes alleged as neglect. Indeed, homelessness or inadequate housing was cited in 40% of Maryland foster-care entries statewide in 2025, and on information and belief, housing is a central allegation in a substantially larger share of Baltimore City removal cases.

107. These poverty-related removals also disproportionately affect Black children and parents. As of October 2021, 80.2% of the children in BCDSS's out-of-home placements were Black, far more than the approximately 68% of Baltimore City's children who were Black. Baltimore City also has the highest foster-care entry rate in Maryland. Because BCDSS routinely treats conditions of poverty as evidence of neglect and these conditions disproportionately affect Black families, the harms of unnecessary family separation fall disproportionately on Black children and their families. And this same pattern holds nationwide: more than 30% of all children, and more than 50% of Black children, will be the subject of an investigation by child protective services by the age of 18.

108. So-called "dirty house" allegations are another type of commonly used allegation to justify "emergency" child removals. In those cases, BCDSS casts housing conditions such as food containers around the house, dishes undone, unpleasant smells, or infestations as posing an

imminent danger to a child. In the Lovetts' case, for example, BCDSS cited [redacted] as reasons for the initial removal.

109. BCDSS also routinely relies on other allegations that rarely present an emergency. It frequently alleges, for example, that parents' mental-health conditions qualify as neglect justifying emergency removal, without any evidence that a parent's mental health condition poses an imminent danger of severe or irremediable injury to a child. Often, the allegations involve common and non-threatening conditions like depression and anxiety. Other petitions assert a range of vague and unverified conditions, sometimes based on decades-old diagnoses, assertions by family or friends, or a caseworker's own unqualified opinions.

110. In the Lovetts' case, for example, BCDSS's petition [redacted] without disclosing that [redacted]. In Ms. Roland's case, BCDSS asked the court at her shelter-care hearing [redacted]

111. BCDSS similarly relies on statements made by parents expressing that they feel overwhelmed or requesting help or assistance with their children as a basis to allege neglect justifying emergency removal.

112. Substance use is also relied on as a basis for removal even where parents are engaged in recommended treatment and where there is no evidence of any injury to the child from the use. For example, BCDSS treats a positive drug test at birth—including for cannabis (which is legal for adults in Maryland) and sometimes for prescribed medications—as a basis to investigate a family, even though Maryland law expressly states that cannabis use alone is not a basis for a finding of neglect. Md. Code Ann., Cts. & Jud. Proc. §3-801(t)(2).

113. Under a policy that Ms. Stocksdale maintains, BCDSS responds to every such referral, including those based solely on cannabis, and/or prescribed medications, by sending a caseworker to investigate. The investigation follows the course described above: questioning, an intrusive home visit, and, at BCDSS's discretion, a "safety plan" or extrajudicial removal. Because BCDSS considers prior investigations and removals as factors weighing in favor of removal, for a pregnant parent involved in prior BCDSS investigations or removals, a positive drug test at birth carries an acute risk of losing her newborn without any hearing.

114. BCDSS also routinely labels widely accepted parenting practices as neglect. BCDSS petitions often allege that children experience "neglect" based on practices like co-sleeping (which roughly 45% of American parents report doing with infants), siblings sharing a bed, or sleeping on a mattress on the floor. For example, in the Lovetts' case, BCDSS included the fact that [redacted] to support the allegations of neglect.

115. More generally, the parental conduct that BCDSS alleges constitutes neglect is constantly shifting, meaning parents live in constant fear that a common parenting practice, economic circumstance or health condition, or a minor misjudgment could result in their child being forcibly taken away without warning.

116. Likewise, the magistrates and judges on the circuit court embrace a capacious and ever-changing notion of neglect that includes common parenting practices, lack of material resources, and a parent's health conditions.

### E. BCDSS Severely Restricts Contact Between Parents And Children During The Separation

117. While separated from their children by defendants, parents typically receive extremely limited contact—which must be supervised—with their children.

118. BCDSS's written policy encourages a first visit within three days of removal. But in practice, caseworkers typically do not arrange a first visit until a week or more after a child is taken. For any child, and especially a young child, even a week apart can feel like a lifetime, compounding the fear and trauma of the removal itself.

119. When visits finally occur, BCDSS policy typically permits a single one-hour visit per week, supervised by a caseworker who observes the family the entire time. Parents therefore must try to comfort, feed, and play with their children while being watched and evaluated, knowing that anything they say or do may be recorded and used against them in court. These stressful circumstances further disrupt parent-child bonds. BCDSS lacks an adequate justification to limit parental visits to one hour per week, and BCDSS imposes these limits without any individualized determination that more frequent or less-restrictive contact would endanger the child.

120. The named plaintiffs' experiences illustrate how these restrictions operate in practice. For example, for more than seventeen months after BCDSS took H.L. from his home, the Lovetts could see their son only at occasional supervised visits—first in the home of the relative caring for the boys, and later, by court order, weekly at a BCDSS visitation center. While D.L. was still in the NICU, BCDSS barred the parents from visiting D.L. in the hospital unless Mr. Lovett's mother or sister was present, which made visits so difficult to arrange that, by mid-March 2025, Mr. Lovett had not seen D.L. since the case began.

121. The Lovetts did everything they could to see their children, even when for Mr. Lovett it meant coming straight from working a double shift. But when the parents asked for unsupervised visits, BCDSS opposed, asserting—in notably vague terms—that [redacted] The court acknowledged that both parents had [redacted] and that their testimony was

[redacted] but, relying in part on [redacted]

122. BCDSS nearly always imposes these visitation limits as a matter of policy and practice, regardless of the allegations in a particular case. The visitation limits thus apply equally to a parent accused of serious abuse and one whose child was taken because the family temporarily lacked stable housing or had what BCDSS deemed to be too dirty of a home.

## III. BCDSS'S POLICIES AND PRACTICES CAUSE HORRIFIC AND IRREPARABLE HARM TO CHILDREN AND THEIR FAMILIES

### A. Removal Causes Irreparable Psychological And Other Damage To Children

123. The moment of removal can shatter a child's basic sense of safety and security with enduring consequences, regardless of how long the separation lasts.

124. Once BCDSS decides to take a child, a caseworker—sometimes accompanied by police officers—physically removes the child from their home, their school, a hospital, the playground, or a neighbor's or relative's house. Newborns may be taken from their mothers' arms in the hospital, sometimes within days of birth. Babies and toddlers are carried away, crying and screaming, from the only caregivers they have ever known. Older children describe the experience as being kidnapped: taken by strangers to an unfamiliar place, unable to reach their families, and with no idea when they will see them again or go home. The trauma of that moment does not end when the child arrives at a placement—or when the child returns home, if that ever occurs.

125. Social-science research confirms that removing a child from a parent is profoundly traumatic and can have lasting harmful effects, even when the period of separation is relatively brief. Any separation in early childhood—even those occurring for short duration—can cause significant distress for young children who often lack the developmental capacity to understand that a parent remains available and will return.

126. Removal changes how children understand their families and their world. Children who experience the state taking them from their parents learn that their parents cannot protect them, undermining the parent's role as the child's source of security and authority. And the fear does not end if the child comes home: Children who have been removed often live with lasting uncertainty and fear that the caseworkers will come back and take them again.

127. Ms. Roland's children experienced exactly this. During the nearly two months they were kept from their mother, they screamed and cried at the end of every visit. Even after returning home, all three children were afraid to go to their grandfather's house, where they had stayed during the separation, because, as Ms. Roland explains, they "do not want to be left there." C.C., now nine, is in therapy to help him cope with the trauma inflicted by BCDSS's forced separation.

128. Such harmful separations can last for months or years. In October 2024, the median length of stay for children in Maryland's out-of-home placements was 22.6 months—nearly *two* years. And over three-quarters of Baltimore children under the age of five who were in out-of-home placements in 2024 remained there for a year or more.

129. Again, the named plaintiffs' separations bear this out. As of the filing of this complaint, H.L. has been separated from his parents for more than 650 days, more than half of his life. D.L., who was taken into state custody when he was less than two months old, has spent nearly his entire life in state custody.

130. Most Maryland children who are removed, moreover, will *never* return to their families, with reunification rates statewide having steadily declined in recent years. Among the 1,480 children who left Maryland's foster system in 2024, only 35.7% rejoined their families.

131. The American Academy of Pediatrics has recognized that family separation exposes children to "toxic stress" that carries significant and often lifelong consequences for their physical, emotional, and developmental well-being.

132. Children who are taken from their parents suffer worse outcomes than comparable children who are allowed to remain home. For example, studies designed to isolate the effects of foster-care placement have found that children who are removed experience higher rates of depression and suicide attempts as well as substance-use disorders, psychotic or bipolar disorders, anxiety disorders, and learning disabilities and developmental delays. As adults, children who were removed from their parents have been found to be more likely to enter the criminal legal system, and to have arrest rates two to three times higher than children who are not removed.

133. Children who are taken from their parents are also often alienated from their communities, including because a removal may require the child to transfer schools, and make it difficult if not impossible for children to see friends from their home neighborhoods. Those social and communal disruptions compound the feelings of loss and isolation that children experience after being torn away from their families by defendants. In Maryland, for example, more than 50% of children removed from their homes were placed in foster or institutional care outside their home county, which can be extremely disruptive to their education and social support system.

134. Many studies, moreover, highlight the pain children who are thrown into foster homes feel from being separated from their siblings, other relatives, pets, and familiar surroundings and belongings; and the feelings of worry and confusion, loss of identity, and decreased self-esteem and sense of belonging that they experience.

135. For example, children report that one of the most painful parts of state seizure is being separated from their siblings, as commonly happens. In Baltimore City, roughly one in four

children in out-of-home placements is separated from all of his or her siblings, and many more are separated from some siblings.

136. Adding to the harm from removal, rates of maltreatment in foster placements are high (and almost certainly even higher than reported). Indeed, foster children are exposed to an astounding *reported* sexual abuse rate of 27%—while only 4% of foster children were removed from their families based on allegations of prior sexual abuse. One study in Baltimore found the substantiated rates of sexual abuse in foster placements to be more than four times the sexual-abuse rate for the general population.

137. Foster placements are also unstable, and placement instability is associated with an increased risk of behavioral conditions, an increased likelihood of abuse, a decreased likelihood of finding permanent homes, and a decreased likelihood of family reunification.

138. All the myriad injuries just discussed cannot be undone by later reunification or a subsequent court ruling. Once a child has experienced the loss of a parent, sibling, home, school, community, or other critical attachment relationship, the developmental, psychological, and emotional consequences can persist for years or even a lifetime.

139. Indeed, for H.L. and D.L., the separation has consumed the most formative period of their lives. D.L., as noted, has never lived at home with his parents; for most of his life, he has seen them only at weekly supervised visits. And H.L. was taken from his parents at nineteen months old and has spent the time since—critical time for the formation of parent-child relationships—from toddlerhood to age three, apart from them. During visits, Mr. Lovett helps D.L. learn to walk, and he does his best to assure both boys that "everything's going to be okay."

### B. Removal Causes Irreparable Psychological And Other Injuries To Parents And Other Family Members

140. Like their children, parents suffer profound and irreparable harms when BCDSS tears apart their families. Indeed, the loss of a child to state custody can disrupt every aspect of a parent's emotional, psychological, social, and physical well-being, inflicting harms that begin the moment of removal and may endure long after the period of separation ends.

141. Parents whose children are seized frequently describe the experience as comparable to the death of a child, reporting symptoms of profound grief.

142. In one study, for example, women who lost custody of their children experienced a loss of identity because they viewed their status as mothers to be a defining feature of who they were.

143. In the same study, one mother explained:

> I went insane. I broke down, nearly died. I couldn't stay in my house. I couldn't be around their clothes … I found myself just wandering around looking for them. Even though, you know, they are not there … It's as if the three of them died. One day just died. That's the grief that I went through. That's the pain that I went through. But meanwhile they didn't [die]. Somebody's got them. Somebody's keeping them from me.

144. Mr. Lovett described the experience in similar terms: "Having my children removed and barely seeing them hurt like hell. It felt like a part of me that I had poured all of myself into had been ripped away." As he put it, "I miss being able to see H.L. and D.L. so much, it breaks my heart."

145. Mothers who have been separated from their children and whose children were placed into the foster system have also been found to experience increased rates of anxiety and substance-use disorders within two years of being separated from their children.

146. Likewise, the separation has taken a measurable toll on the Lovetts. Ms. Lovett's

[redacted]

[redacted] And [redacted]. Yet for nearly six more months, the Lovetts remained limited to a single supervised visit each week.

147. Nor, of course, does the harm to parents simply vanish when a case closes. Ms. Roland's children were returned to her and her case was dismissed, but she lives in "constant fear" that her children will be taken again and that BCDSS will take her newborn at the hospital.

148. Losing a child to the system can even increase the risk of death for parents: One study demonstrated that mothers whose children were in the foster system were 3.5 times more likely to die from causes such as unintentional injury and suicide, and nearly 3 times more likely to die from conditions such as heart disease.

**C. Judicial Officers Fail To Weigh The Enormous Harms Inflicted By Removal**

149. In approving continued separation, the judicial defendants do not consider the substantial and often irreparable harms that removal inflicts. Nor do defendants balance that well-documented harm against any alleged harm if the child remains in the home pending notice and a hearing. Instead, they have a policy and practice of considering only the vague, undefined question of whether returning the child to the parent's home would be "contrary to the welfare" of the child.

150. This practice runs counter to the American Law Institute's Restatement of Children and the Law, which instructs courts to weigh the harm of a child remaining at home with the myriad harms of removal before ordering that a child be seized.

151. Additionally, judges and magistrates routinely fail to consider whether removal is the least restrictive means of protecting the child, i.e., whether services or assistance that could be provided while the child remains at home would address the agency's concerns.

152. The named plaintiffs' cases are representative of all this. Earlier this year, Magistrate Kataria, presiding over the case of the Lovetts, found [redacted]. She nonetheless continued H.L.'s and D.L.'s separation from their parents for at least six more months, based on [redacted] The magistrate made no finding that [redacted] To the contrary, she had earlier explained that because [redacted] That gets things backwards: BCDSS should have to provide individualized reasons for separating parents from young children, who are especially vulnerable to the harms of separation.

## IV. Defendants Deny Families A Prompt And Meaningful Hearing After Removal

### A. The Initial Hearing Is A Brief Formality At Which Families Cannot Meaningfully Contest The Separation

153. For a parent whose child has been taken by BCDSS, the process unfolds with minimal access to information and limited time to respond to the agency's allegations.

154. When it seizes a child based on a purported emergency, BCDSS is supposed to provide an "emergency authorization" form (which may outline the basis for the removal but does not contain the allegations BCDSS will make in court), inform the parents they will have an initial hearing the next business day, and give them a phone number for the public defender's intake line, with instructions to call the intake line on the morning of the hearing.

155. Neither the parent of the removed child nor counsel is told the specific allegations supporting the emergency removal until BCDSS files its petition, which usually does not happen until a few hours (or less) before the hearing. Parents and their lawyers thus have, at most, a few

hours to investigate the allegations, gather documents, and find witnesses before the brief proceeding where they could ask that the child be returned home.

156. At the initial post-removal hearing—which is typically conducted not by a circuit court judge but by a magistrate appointed by the judges of the circuit court—the only issue before the court is whether the child should be kept in state custody while awaiting a full hearing on the merits of whether abuse or neglect occurred. This initial "shelter care" determination is separate from the question of whether the child is in need of assistance.

157. In practice, judicial officers consider at the initial hearing only whether returning the child would be "contrary to the welfare" of the child, often finding the "contrary to the welfare" standard satisfied based on a wide range of conduct that BCDSS labels as neglect. And the standard that magistrates and judges in Baltimore choose to apply permits BCDSS to continue separation based solely on its own untested account of the facts. That standard does not require any finding that continued separation is necessary to protect the child from severe injury, that less-restrictive alternatives are insufficient, or that the harms of removal are outweighed by the danger if the child remains in the home. Thus, judges and magistrates, as a matter of routine practice, keep children from parents based on nothing more than their subjective, generalized view of the child's "welfare" and what might be "contrary" to it.

158. At the initial hearing, moreover, the rules of evidence do not apply, *see* Md. Rule 5-101(b)(11), and judicial officers construe the "reasonable grounds" standard to require no documentary or testimonial evidence from BCDSS—often resting their findings on the petition and counsel's proffers, including hearsay that no witness is called to support.

159. In short, the initial post-removal hearing is a perfunctory appearance, at which Baltimore City Circuit Court judges and magistrates rubber stamp extrajudicial emergency

seizures and almost uniformly commit children to continued state custody pending a subsequent hearing on the merits of BCDSS's allegations.

160. Indeed, initial hearings are conducted virtually and scheduled for only thirty minutes—of which ten to fifteen minutes are usually consumed by appearances and scheduling, leaving no more than fifteen minutes to address substantive issues. Sometimes the hearings are scheduled for only fifteen minutes. As noted, parents typically are not permitted even to speak except to state their names. The seized children—even those who are adolescents or teenagers, and therefore old enough to express an opinion about what happens in their lives—are almost never present.

161. Moreover, although every child who is the subject of a CINA petition is also entitled to his or her own court-appointed lawyer, *see* Md. Code Ann., Cts. & Jud. Proc. §3-813(d), in practice, children's lawyers—who typically speak with their clients only briefly beforehand—have little to work from other than BCDSS's allegations, and almost always support separation. At initial hearings, therefore, children have no meaningful opportunity to present evidence, offer their own account, or tell the court whether they want to return home to their parents.

162. Parents likewise have little or no meaningful opportunity to present evidence at the initial hearing. For example, Baltimore City Circuit Court judges and magistrates typically deny any requests to offer live witness testimony at the initial hearing, citing purported time constraints. If parents or children wish to present testimony, the judge or magistrate will almost always reschedule the matter for a "contested shelter hearing," often days or weeks later. This means that children and parents will not have a hearing within sixty-five hours of the formal "removal" of the child if they wish to explain what they have experienced and offer their perspective on why removal is inappropriate, what resources or alternatives to removal might ameliorate any legitimate

issues, the specific harm the child will experience if removed, or where the child might be placed to best preserve the parent-child bond if removal is deemed necessary. Under Fourth Circuit precedent, this delay means no constitutionally adequate hearing is provided—even assuming the emergency removal without a hearing was justified in the first place. *See Jordan*, 15 F.3d at 351.

163. In those cases where the removal was first effectuated via a "safety plan," the delay before an initial hearing is even longer. For example, Ms. Roland and her children did not receive a hearing until almost two months after they were separated. The Lovetts and their children had no hearing for almost a month after they were separated.

164. Even when a judge or magistrate permits live testimony at an initial hearing, appellate case law limits parents to "testimony of witnesses which directly contradicts the allegation of abuse." *In re Damien F.*, 182 Md. App. 546, 585 (2008). Parents thus can be barred from offering whole categories of evidence relevant to determining whether returning a child to their home would be "contrary to [their] welfare"—such as evidence about the strength of the parent-child bond, the child's support systems, available alternatives to removal, important context concerning the allegations in the petition, the child's attachment to his family, school, and community, and the harm of disrupting that attachment if the child is taken from their home.

165. This limitation is wholly one-sided: BCDSS is permitted to proffer facts far beyond the allegations in the petition, and its witness—typically the caseworker, who is often the same individual who made the original allegations prompting removal—is permitted to repeat hearsay under a regime in which, as explained, the rules of evidence do not apply.

166. After failing to require documents or testimony from BCDSS to actually assess the facts or gauge credibility, and without hearing fully from parents and children, Baltimore City Circuit Court judges and magistrates unsurprisingly almost always adopt BCDSS's version of

events at the initial hearing and find "reasonable grounds" to believe that returning a child home would be contrary to the child's welfare. They typically do not address whether removal was necessary due to an emergency, and when they find that BCDSS made "reasonable efforts" to avoid removal, they typically do so solely on the basis of BCDSS's conclusory proffers. Md. Code Ann., Cts. & Jud. Proc. §3-815(d); Md. Rule 11-204(d)(1). The judicial defendants thus almost always grant BCDSS's requests for continued state custody. On information and belief, several magistrates who have presided over such hearings in Baltimore City for many years have *never* denied a BCDSS request to keep a child in state custody at an initial hearing.

167. A magistrate's findings and recommendations at an initial hearing are not final orders of the court, but a magistrate may order that a child be kept in state custody while the court reviews those findings and recommendations. Md. Code Ann., Cts. & Jud. Proc. §3-807(d). A party that loses before the magistrate may seek "immediate review" by a judge. Md. Rule 11-204(4). But in Baltimore, that review is anything but immediate: It typically takes more than three days—and sometimes weeks—for a family to get a review hearing before a judge.

168. Knowing the imbalanced playing field at the initial hearing, lawyers often advise clients that trying to challenge continued family separation at the initial hearing is not worthwhile, given the trauma caused by presenting a defense, that opening the case with a loss could prejudice them later, and that creating an incomplete and one-sided record at this early stage could undermine their arguments at a later adjudication.

169. If a judge or magistrate grants BCDSS's request to keep the child in state custody after an initial hearing, BCDSS enforces that order by selecting where a child will live within the bounds of the court order—whether it be a foster home, a relative's home, a group home, or another facility—and by keeping the child away from his or her parents.

170. Once a child is placed in BCDSS custody, the agency has full authority to make any placement or visitation decision that is not inconsistent with a court order. BCDSS thus decides how often visits occur, where they occur, and whether the child will be moved to a new placement.

171. The scheduling and conduct of the initial hearings reflect policies adopted and enforced by Judges Carrión and Blomquist, who control the Juvenile Division's docket and calendar. They have the authority to allocate sufficient time for a meaningful initial hearing and to require judicial officers to determine whether continued separation is necessary to protect the child from severe injury—but they have instead established, implemented, and acquiesced in a practice of scheduling brief appearances at which neither occurs.

172. Defendants' conduct at initial post-removal hearings operates largely out of public view. By statute and rule, child-removal proceedings in Baltimore City Circuit Court are closed to the public and the records are confidential. *See* Md. Code Ann., Cts. & Jud. Proc. §§3-810(b), 3-827; Md. Rule 11-108(d)(1). The practices described here thus receive virtually no scrutiny, preventing the people of Baltimore from holding BCDSS and judicial officers accountable for their actions. Those limits further impede efforts to identify and remedy systemic problems and make it more difficult for families to obtain support and accountability. Those protections also obscure the reality that BCDSS routinely takes children from loving families unnecessarily and without justification, often based on false allegations or invented emergencies.

### B. Children And Parents Must Wait Months For Any Opportunity To Contest BCDSS's Allegations At An Adjudicatory Hearing

173. The adjudicatory hearing is typically a family's first real opportunity to challenge the removal of their children, including by contesting the truth of BCDSS's allegations. At an adjudicatory hearing, BCDSS must finally prove the allegations of abuse or neglect in the petition,

by a preponderance of the evidence. Md. Code Ann., Cts. & Jud. Proc. §§3-815(c)(1), 3-815(c)(4), 3-817. The rules of evidence apply. Md. Code Ann., Cts. & Jud. Proc. §3-817.

174. But because of defendants' policies and practices, those hearings often do not happen until months after a removal occurs. Those policies and practices are contrary to Maryland law. State law requires that when a child is taken into state custody, the adjudicatory hearing be held within thirty days of the state assuming custody. Md. Code Ann., Cts. & Jud. Proc. §3-815(c)(4); Md. Rule 11-213(b). Baltimore City Circuit Court judges and magistrates, however, have a policy and practice of refusing to schedule adjudication trials within that period. Instead, they schedule an "adjudication settlement," a proceeding unknown to Maryland law, at which parents and children may either accept BCDSS's allegations in whole or through stipulated facts, or say that they dispute them. They may not present evidence or argument. If a parent or a child refuses to agree to the allegations or to stipulate to facts supporting an abuse or neglect finding, the Baltimore City Circuit Court schedules a *later* adjudicatory hearing, typically months if not over a year after the initial removal, to actually consider the merits of BCDSS's petition. Children remain in state custody, away from their homes and loved ones, throughout the process.

175. The named plaintiffs' experiences illustrate all this. Ms. Roland, for example, had no chance to contest BCDSS's allegations until February 26, 2026, more than three months after BCDSS filed its petition and nearly five months after it separated her from her children.

176. As a result of defendants' policy and practice of denying parents and children an adjudication of BCDSS's allegations within thirty days of the petition's filing, parents and children routinely suffer forced separation for months or a year or more following an extrajudicial "emergency" removal.

177. When an adjudicatory hearing finally occurs, if the court finds that BCDSS's allegations are supported by evidence, it then decides at a disposition hearing whether the child is a child in need of assistance and, if so, whether to return the child to a parent or commit the child to BCDSS's custody. Md. Code Ann., Cts. & Jud. Proc. §3-819(b)(1)(iii); Md. Rule 11-216(c)-(d). The disposition hearing is supposed to be held the same day as the adjudicatory hearing or immediately following—but given the court's scheduling practices is routinely delayed until weeks or months later. Md. Code Ann., Cts. & Jud. Proc. §3-819(a); Md. Rule 11-216(b).

178. The months of delay between a removal and the adjudicatory and disposition hearings not only postpone a family's constitutionally guaranteed day in court, but also have a significant impact on a family's chance at reunification. At disposition, judges and magistrates determine whether a child is returned home based on the "best interest of the child." By the time a family reaches that point in the process, the child will have spent many months living apart from their parents—and the length of that separation, along with the new routines and relationships the child has formed in placement, is often considered by judges, when deciding whether to return the child home. In other words, the delay that defendants impose itself becomes a reason to keep the family apart.

179. Indeed, once a child has been in state custody for fifteen of the most recent twenty-two months, BCDSS is *required* to petition to terminate parental rights. Md. Code Ann., Fam. Law §5-525.1(b)(1). Termination permanently severs the legal relationship between parent and child, leaving them legal strangers with no right to see one another. Every month that defendants delay a family's adjudication thus pushes a family closer to that fifteen-month triggering point.

## V. BALTIMORE SEPARATES FAMILIES EVEN WHEN REMOVAL IS NOT NECESSARY AND IS MORE ONEROUS THAN AVAILABLE ALTERNATIVES

### A. Defendants Regularly Ignore Readily Available Less-Restrictive Alternatives To Removal

180. Due Process requires judges and magistrates to consider less-restrictive alternatives to removal. This requirement matters for two reasons: First, when the concerns BCDSS identifies could be addressed while the child stays home, there is no emergency that requires removal without a court order. Second, once a child has been removed, the state may keep parent and child apart only if separation is necessary—that is, only if no less-restrictive alternative would protect the child.

181. Less-restrictive alternatives to removal include help that BCDSS can provide or arrange directly—for example, assistance with moving costs, security deposits, or utility bills; cribs and other basic baby supplies; assistance accessing benefits; provision of in-home family preservation services; referrals to pre-petition advocacy programs; and facilitating and coordinating medical care for parents and children.

182. While BCDSS rarely offers any of these types of assistance to families, it does provide substantial material support to the relatives and strangers who care for the children it removes. But when a family's lack of resources is the source of most of the concerns that lead BCDSS to remove a child, it makes little sense for BCDSS to provide resources to a foster provider after separating the family and inflicting irreparable harm rather than keeping the family together and providing those same resources to the child's own parents.

183. In particular, when families struggle with housing instability, childcare problems, or other poverty-related hardships, those concerns can often be addressed with material resources while keeping children safely at home. And a substantial body of evidence shows that helping

meet families' material needs reduces reports to child-protective agencies, investigations, and removals, and increases rates of reunification.

184. One readily available alternative is for BCDSS to refer families it is investigating to pre-petition advocacy programs such as Baltimore's Better Together program. Better Together serves families who are already the subject of BCDSS investigations, providing assistance from a multi-disciplinary team of social workers, attorneys, and other advocates whom parents can trust and work with freely without fear that sharing their struggles will put them at risk of losing their kids. Better Together helps families resolve housing and benefits issues, connect to mental-health and substance-use treatment, prepare for BCDSS home visits, develop plans that permit children to remain safely at home, and obtain other services directed at addressing concerns raised during an investigation.

185. Data on pre-petition and early-defense programs like Better Together nationwide indicate that such programs are highly effective at preventing child removal and produce cost savings of roughly 50% compared to foster-care placement programs.

186. When BCDSS first engages with a family at risk of removal, its caseworker could refer the families to Better Together for legal support and social-work advocacy rather than pursuing an emergency removal. For many families, that referral would mean the difference between keeping their children at home and being separated for months or longer. But as a matter of policy and practice set and maintained by Ms. Stocksdale, BCDSS does not make those referrals.

187. Providing housing or rental assistance to families experiencing housing instability would be another effective alternative to removal in many cases. Housing instability is a major cause of family separation, especially in urban areas like Baltimore City, where many petitions allege housing instability.

188. In a study of families subject to child-welfare investigations who were experiencing housing instability, children in families who entered supportive housing showed fewer removals (9% vs. 40%) and higher reunification rates (30% vs. 9%) after two years than those who did not.

189. Research on monetary support delivered through child-welfare services points the same way: studies show that expanding families' access to such assistance reduces child-protective investigations and foster-care entries. Specifically, families with open child-welfare cases who receive home-based services with concrete support, averaging $314 per family, are less likely to be the subject of a later hotline call, and any concrete support reduces that risk by almost 17%. BCDSS itself processes Baltimore City families' applications for such assistance, including the Food Supplement Program (Maryland's SNAP program) and Temporary Cash Assistance, and so is well positioned to connect families with those resources.

190. Rather than offering that kind of support, BCDSS typically directs parents (often as a condition of a "safety plan" or of reunification) to complete psychosocial services such as therapy, parenting classes, anger management—even where those "services" do not address the concerns BCDSS identified. At the same time, the agency fails to consider whether unmet material needs, rather than any genuine danger to a child, are causing the concerns identified during an investigation. Material assistance can also improve parents' ability to complete the very programs that agencies frequently require families to take to avoid removal or achieve reunification.

191. The judicial defendants also fail to ensure that BCDSS employs available less-restrictive alternatives to separation. Plaintiffs are not aware of a single instance in which a Baltimore judge or magistrate found during an initial post-removal hearing that BCDSS did not make reasonable efforts to avoid a removal.

192. BCDSS's allegations that it made "reasonable efforts" often largely center on the *investigative* steps BCDSS took. For example, BCDSS may allege that investigators "met with mother," "spoke to child," or "conducted a home visit." None of those steps addresses the less-restrictive alternatives discussed above, i.e., the support that could have been provided to a family in place of seizing a child. And none constitutes reasonable efforts to avoid a removal.

193. The named plaintiffs' experiences illustrate how readily available support could have kept their families together.

194. For example, the concerns BCDSS cited when it took H.L. from the Lovetts were, at bottom, related to symptoms of poverty: [redacted] Each of those concerns could have been addressed without separating the family—for example, [redacted]. Indeed, Ms. Lovett's therapist told BCDSS that, [redacted] BCDSS offered the family none of that support, either before or after taking H.L.

195. Instead, BCDSS provided support to someone else. [redacted] And BCDSS has paid Mr. Lovett's sister to care for H.L. and D.L. throughout their time in state custody. As Mr. Lovett put it, "I don't understand why BCDSS is paying my sister to take care of H.L. and D.L., when it would not have to pay us to do so." Meanwhile, the Lovetts resolved their housing concerns without BCDSS's help, moving into a two-bedroom apartment within days of the emergency authorization for shelter care, a home BCDSS later found [redacted]

196. BCDSS's petition described its [redacted] None of those steps could address the actual concerns BCDSS identified, i.e., [redacted] BCDSS instead required the parents to [redacted]—none of which, again, addressed the concerns *BCDSS itself* identified—all the while their children remained out of the home.

197. Ms. Roland's family likewise needed housing, not separation: BCDSS's concerns centered on [redacted] But BCDSS [redacted]; Ms. Roland rented a three-bedroom apartment on her own within weeks, and BCDSS [redacted]

**B. The Available Less-Restrictive Alternatives Cost Less Than Removal**

198. Defendants cannot claim that the less-restrictive alternatives just discussed are too costly. Those alternatives are in fact cheaper than removing children and keeping them in state custody.

199. In Maryland, the average cost of a single "bed" for a child in state custody is $388 per day. And this number does not capture the cost of paying for the court proceedings required to separate families, including lawyers, court staff, judges, and magistrates.

200. Far less expensive than $388 per day is the assistance BCDSS itself administers. Baltimore City families may apply to BCDSS for the Temporary Cash Assistance program, under which the maximum monthly grant for a family of three is about $753—roughly what two days of a single child's out-of-home placement costs. BCDSS also administers Emergency Assistance to

Families with Children, which provides emergency cash to families facing eviction or the shut-off of gas, electric, or water service. And BCDSS operates in-home, family preservation services that can assist families with housing, utilities, transportation, and child care in order to prevent out-of-home placement. Other in-home, evidence-based services that help prevent removal are priced at roughly $37 to $165 per child per day for a time-limited period. Yet BCDSS rarely connects families facing removal with this assistance, or treats it as an alternative to separating them.

201. BCDSS has the discretion to allocate its resources to provide significant material support to families to keep them together, rather than removing children, and it controls how it deploys its own caseworkers and the assistance it administers. It could direct that assistance, and referrals to programs like Better Together, to families at risk of separation before seeking to remove a child. It has chosen not to.

202. In short, BCDSS consistently chooses to spend vast amounts to separate families rather than spending similar or lesser amounts to keep families together, all the while causing unnecessary and irreparable harm to children and families.

## VI. Defendants Fail To Train And Supervise Staff Adequately To Ensure Lawful Removal Practices

203. BCDSS has failed to develop, implement, or enforce clear standards distinguishing true emergencies from non-emergency circumstances. The result is a pattern and practice of removals by under-trained and under-supervised caseworkers based on housing instability, poverty-related conditions, mental-health concerns, substance use, and other circumstances that frequently present no imminent danger of severe or irremediable injury, approved by supervisors without any meaningful effort to keep the family together.

204. BCDSS likewise has failed to train and supervise staff adequately regarding alternatives to family separation and the obligation to keep families together whenever possible.

The agency routinely authorizes removals without ensuring that caseworkers have meaningfully explored less-restrictive alternatives, including providing material support or connecting families to services.

205. Although Maryland law and agency policy contemplate reasonable efforts to preserve families and avoid removal, BCDSS supervisors routinely approve removals when no such efforts have been made. The predictable result is a system in which family separation becomes the default rather than a last resort.

206. The violations alleged here result from deliberate policy choices by defendants, not isolated errors. And BCDSS's failure to train and supervise caseworkers on what constitutes an emergency justifying removal without a court order, and on the obligation to consider alternatives, reflects deliberate indifference to the obvious consequence, that children will be seized in circumstances presenting no emergency.

207. BCDSS likewise fails to adequately train, supervise, and discipline its staff to prevent staff offering false statements in court. As the named plaintiffs' cases show, BCDSS's petitions routinely include allegations that the agency knows or should know are false, such as the allegation that [redacted]. On information and belief, when such falsehoods come to light, BCDSS does not discipline the caseworkers responsible.

## CLASS ALLEGATIONS

208. This action is properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

209. The Children's Class, represented by C.C., R.R., and R.H., is defined as all children who are or will be seized or otherwise separated from their parents by BCDSS.

210. The Parents' Class, represented by Candace Lovett, Edward Lovett, and Regina Roland, is defined as all parents whose children are or will be seized or otherwise separated from their parents by BCDSS. The Parents' Class and Children's Class together are referred to herein as the "Classes."

211. The Classes are sufficiently numerous to make joinder impracticable. BCDSS conducts nearly all of its removals extrajudicially, separating more than 400 children from their families each year. While the exact number of current members in each class is unknown to plaintiffs at this time, the Classes exceed several hundred members. They are also transitory, as parents and children are continually entering or exiting, which further makes joinder impracticable.

212. The questions of fact and law raised by plaintiffs' claims are common to and typical of those of each putative member of the class they seek to represent, such that they would predominate over any questions affecting individual class members. Questions of fact common to the Classes include whether BCDSS maintains a policy or practice of removing children without notice and a hearing absent a genuine emergency; whether defendants provide constitutionally adequate process in connection with removals; and whether defendants require adequate justification before separating families or continuing a separation, consider less-restrictive alternatives and the harms of removal, and adequately train and supervise staff to ensure lawful child-removal practices.

213. Questions of law common to the Classes include:

a. Whether defendants' long-standing and well-documented actions or inactions violate the Children's Class's rights under the Fourth Amendment to the U.S. Constitution.

b. Whether defendants' long-standing and well-documented actions or inactions violate the Classes' rights under the Fourteenth Amendment to the U.S. Constitution to procedural due process.

c. Whether defendants' long-standing and well-documented actions or inactions violate the Classes' rights under the Fourteenth Amendment to the U.S. Constitution to substantive due process.

d. Whether defendants' long-standing and well-documented actions or inactions violate the Children's Class's rights under Article 26 of the Maryland Declaration of Rights.

e. Whether defendants' long-standing and well-documented actions or inactions violate the Classes' rights under Article 24 of the Maryland Declaration of Rights to procedural due process.

f. Whether defendants' long-standing and well-documented actions or inactions violate the Classes' rights under Article 24 of the Maryland Declaration of Rights to substantive due process.

g. Whether defendants' long-standing and well-documented actions or inactions violate the Parents' Class's rights under Article 48 of the Maryland Declaration of Rights.

h. Whether defendants have a policy, practice, or custom of violating the Children's Class's rights under the Fourth Amendment and Article 26 of the Maryland Declaration of Rights, the Classes' rights under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights to procedural due process, the Classes' rights under the Fourteenth Amendment and Article

24 of the Maryland Declaration of Rights to substantive due process, and/or the Parents' Class's rights under Article 48 of the Maryland Declaration of Rights.

214. The legal violations and harms suffered by the plaintiffs are typical of the legal violations and harms or risk of harms experienced by all plaintiffs in the Classes.

215. Defendants have acted or failed to act on grounds generally applicable to all members of the Classes, necessitating class-wide declaratory and injunctive relief.

216. Defendants' unconstitutional policies and practices have caused class members to suffer common injuries, including the loss of familial association, unlawful separation from family members, emotional distress, psychological harm, and other compensable injuries. Questions concerning defendants' liability and the resulting damages are capable of classwide resolution, and a class action under Rule 23(b)(3) is superior to individual litigation.

217. Plaintiffs and their counsel will adequately and fairly protect the interests of all members of each class. The interests of the class representatives are consistent with those of their respective class members. In addition, counsel for plaintiffs are experienced in class actions and civil-rights litigation, and have expertise in the conduct of BCDSS removals.

218. Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Classes through trial and any appeals.

219. Counsel for the Classes know of no conflicts among members of either class.

## CAUSES OF ACTION

## COUNT ONE

### (Under 42 U.S.C. §1983 on Behalf of Children Plaintiffs and the Children's Class for Violations of the Fourth Amendment)

220. Each of the foregoing allegations is incorporated as if fully set forth herein.

221. By taking children into state custody, BCDSS "seizes" them within the meaning of the Fourth Amendment. Such seizures without a court order or a true emergency violate the Fourth Amendment's prohibition on unreasonable seizures.

222. BCDSS, Ms. Stocksdale, and Mr. Afolabi likewise seize children, and deprive parents of custody without any pre-deprivation process, when BCDSS separates families through "safety plans" that parents accept only under threat of formal removal or based on the belief that a court has ordered the separation, in circumstances where no emergency would have justified removal without a court order.

223. Through its policy and practice of conducting nearly every removal extrajudicially, BCDSS seizes children without probable cause to believe that the requisite emergency exists.

224. Through their actions, BCDSS, Ms. Stocksdale, and Mr. Afolabi directly and proximately have caused and continue to cause the deprivation of the rights of the Children Plaintiffs as well as members of the Children's Class under the Fourth Amendment.

225. The Children Plaintiffs as well as members of the Children's Class face an immediate risk that their Fourth Amendment rights will be violated in the future. They have no adequate remedy at law and will suffer irreparable harm to their constitutional rights unless defendants are enjoined from continuing their policy, practice, or custom of unconstitutional emergency removals.

226. Ms. Stocksdale and Mr. Afolabi have acted with reckless and callous indifference to the Fourth Amendment rights of the Children Plaintiffs and the Children's Class. Ms. Stocksdale has chosen not to require caseworkers to seek judicial authorization before taking a child, knowing that BCDSS takes children when there is no imminent danger of severe or irremediable injury. BCDSS caseworker Mr. Afolabi separated C.C., R.R., and R.H. from their

mother without a court order in reckless disregard of whether any emergency justified doing so. The Children Plaintiffs and members of the Children's Class are therefore entitled to compensatory and punitive damages against Ms. Stocksdale and Mr. Afolabi in their personal capacities.

## COUNT TWO

### (Under 42 U.S.C. §1983 on Behalf of Plaintiffs, the Parents' Class, and the Children's Class for Violations of Procedural Due Process)

227. Each of the foregoing allegations is incorporated as if fully set forth herein.

228. Procedural due process entitles all plaintiffs to judicial hearings prior to a child's removal from his or her parent(s) unless there is an objectively reasonable basis to believe that a child is in imminent danger of severe or irremediable injury before notice and a hearing can be provided or judicial authorization can otherwise be obtained.

229. Defendants deprive plaintiffs of this right by seizing children without any pre-deprivation process or hearing where no such danger exists.

230. Defendants likewise seize children, and deprive parents of custody without any process, when BCDSS separates families through "safety plans" that are dictated to parents or that parents accept only under threat of removal or based on the belief that a court has ordered the separation, in situations where no emergency would have justified removal without a court order.

231. Procedural due process further requires that, when the state separates parent and child without a prior hearing, it must promptly provide a meaningful post-deprivation hearing—one at which the parent and child have adequate notice of the allegations, are represented by counsel, and have an opportunity to confront BCDSS's evidence and to present their own on the issues that bear on whether separation is necessary.

232. Defendants deprive plaintiffs of this right by (1) providing only a perfunctory initial hearing after separation at which parents and children cannot present or confront evidence, and at

which judges and magistrates do not determine whether continued separation is necessary to protect the child from severe injury; and (2) delaying any opportunity to contest the separation with actual evidence for days, weeks, or months, and restricting the evidence parents may present when that opportunity finally comes.

233. Defendants' policy, practice, or custom has directly and proximately caused and continues to cause the deprivation of plaintiffs' rights under the Fourteenth Amendment.

234. Plaintiffs and members of the Classes face an immediate risk that their Fourteenth Amendment rights will be violated in the future. Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless defendants are enjoined from continuing their policy, practice, or custom of unconstitutional emergency removals and constitutionally deficient post-removal proceedings.

235. Ms. Stocksdale and BCDSS caseworkers acted with reckless and callous indifference to plaintiffs' federally protected rights. Ms. Stocksdale has chosen not to require caseworkers to seek judicial authorization before taking a child, knowing that BCDSS takes children when there is no imminent danger of severe or irremediable injury. Ms. Smith directed the return visit that led to H.L.'s removal without a court order. Mr. Afolabi separated C.C., R.R., and R.H. from their mother without a court order in reckless disregard of whether any emergency justified doing so. Plaintiffs and members of the Classes are therefore entitled to compensatory and punitive damages against Ms. Stocksdale and BCDSS caseworkers Ms. Smith and Mr. Afolabi in their personal capacities.

236. Judges Carrión and Blomquist caused these deprivations through the policies and practices described above, and Plaintiffs and members of the Classes are entitled to compensatory damages against them.

## COUNT THREE

**(Under 42 U.S.C. §1983 on Behalf of Plaintiffs, the Parents' Class, and the Children's Class for Violations of Substantive Due Process)**

237. Each of the foregoing allegations is incorporated as if fully set forth herein.

238. Parents and children share a fundamental right to family integrity, and the state may not infringe on that right unless doing so is necessary and narrowly tailored to a compelling interest, with no less-restrictive alternative available. Defendants interfere with that right in two ways.

239. First, BCDSS separates families, through formal removals and "safety plans" alike, when separation is not necessary, including when no emergency exists and less-restrictive alternatives would protect the child. Second, judicial officers continue those separations without finding that separation is necessary, without considering less-restrictive alternatives, and without weighing the harms of separation. BCDSS keeps children in state custody for well over sixty-five hours without any judicial authorization, and enforces orders to keep children in state custody that are deficient (even when issued within sixty-five hours).

240. Defendants' policy of knowingly or recklessly providing the court with false information and withholding material information that would undermine the allegations further interferes with plaintiffs' right to family integrity.

241. Defendants' policies, practices, and/or customs have directly and proximately caused and continue to cause the deprivation of the right to family integrity of plaintiffs and the Parents' and Children's Classes guaranteed by the Fourteenth Amendment.

242. Plaintiffs and members of the Classes face an immediate risk that this right will be violated in the future. Plaintiffs have no adequate remedy at law and will suffer irreparable harm

to their constitutional rights unless defendants are enjoined from continuing their policy, practice, and/or custom of unconstitutional emergency removals.

243. Ms. Stocksdale and BCDSS caseworkers acted with reckless and callous indifference to plaintiffs' federally protected rights. Ms. Stocksdale has chosen not to require caseworkers to seek judicial authorization before taking a child, knowing that BCDSS takes children when there is no imminent danger of severe or irremediable injury. Ms. Smith directed a caseworker to return to the Lovetts' home with police officers and approved the decision to remove H.L. from his parents without a court order and without any emergency justifying that removal. Mr. Afolabi separated C.C., R.R., and R.H. from their mother without a court order in reckless disregard of whether any emergency justified doing so. Plaintiffs and members of the Classes are therefore entitled to compensatory and punitive damages against Ms. Stocksdale and BCDSS caseworkers Ms. Smith and Mr. Afolabi in their personal capacities.

244. Judges Carrión and Blomquist caused these deprivations through the policies and practices described above, and Plaintiffs and members of the Classes are entitled to compensatory damages against them.

## COUNT FOUR

**(On Behalf of Children Plaintiffs and the Children's Class for Violations of Article 26 of the Maryland Declaration of Rights)**

245. Each of the foregoing allegations is incorporated as if fully set forth herein.

246. Article 26 of the Maryland Declaration of Rights protects against unreasonable seizures. Taking a child into state custody constitutes a seizure within the meaning of Article 26.

247. Ms. Stocksdale maintains a policy and practice of removing children without prior judicial authorization and without a true emergency requiring immediate action. Mr. Afolabi removed C.C., R.R., and R.H. from their mother under that policy, without a court order, valid

consent, or any emergency, and supported the removal with statements he knew were false. Those defendants thereby violated the Article 26 rights of Children Plaintiffs and members of the Children's Class.

248. Ms. Stocksdale and Mr. Afolabi acted with malice or gross negligence, for the reasons stated above. The Children Plaintiffs and members of the Children's Class seek damages on this count against Ms. Stocksdale and Mr. Afolabi in their personal capacities.

**COUNT FIVE**

**(On Behalf of Plaintiffs, the Parents' Class, and the Children's Class for Violations of Procedural Due Process under Article 24 of the Maryland Declaration of Rights)**

249. Each of the foregoing allegations is incorporated as if fully set forth herein.

250. Article 24 of the Maryland Declaration of Rights guarantees procedural due process before the state interferes with fundamental liberty interests.

251. Procedural due process entitles all plaintiffs to judicial hearings prior to a child's removal from his or her parent(s) unless there is an objectively reasonable basis to believe that a child is in imminent danger of severe or irremediable injury before notice and a hearing can be provided or judicial authorization obtained.

252. Defendants deprive plaintiffs of these rights by seizing children without pre-deprivation process, by failing to provide timely notice of the allegations, by denying a prompt and meaningful hearing, by barring parents from presenting critical evidence, by offering and endorsing false statements in removal petitions, and by denying parents and children a contested hearing for months, resulting in prolonged separations.

253. Defendants' policy, practice, and/or custom has directly and proximately caused and continues to cause the deprivation of plaintiffs' procedural due process rights under Article 24 of the Maryland Declaration of Rights.

254. Ms. Stocksdale, Mr. Afolabi, Ms. Smith, and Judges Carrión and Blomquist acted with malice or gross negligence, for the reasons stated above. Plaintiffs and members of the Classes seek damages on this count against those defendants in their personal capacities.

**COUNT SIX**

**(On Behalf of Plaintiffs and the Parents' and Children's Classes for Violations of Substantive Due Process under Article 24 of the Maryland Declaration of Rights)**

255. Each of the foregoing allegations is incorporated as if fully set forth herein.

256. Article 24 of the Maryland Declaration of Rights protects the fundamental right of parents and children to maintain their family relationships free from arbitrary state interference.

257. Defendants' policy of separating families where removal is not necessary, where less-restrictive alternatives exist, on the basis of knowing and/or reckless false statements, and without weighing the documented harms of removal, unconstitutionally interferes with that fundamental right.

258. Defendants' policy, practice, and/or custom has directly and proximately caused and continues to cause the deprivation of the rights of plaintiffs and the Parents' and Children's Classes guaranteed by Article 24 of the Maryland Declaration of Rights.

259. Ms. Stocksdale, Mr. Afolabi, Ms. Smith, and Judges Carrión and Blomquist acted with malice or gross negligence, for the reasons stated above. Plaintiffs and members of the Classes seek damages on this count against those defendants in their personal capacities.

**COUNT SEVEN**

**(On Behalf of Parent Plaintiffs and the Parents' Class for Violations of Article 48 of the Maryland Declaration of Rights)**

260. Each of the foregoing allegations is incorporated as if fully set forth herein.

261. Article 48 of the Maryland Declaration of Rights guarantees the "fundamental right to reproductive freedom," including the right to make and effectuate decisions about whether to

become a parent and how to raise one's children. When the state takes away a person's children, it directly and indirectly denies, burdens, and abridges that person's right to reproductive freedom, such that the state's action must be justified by a compelling state interest achieved by the least restrictive means.

262. Defendants substantially burden the right of the Parent Plaintiffs to reproductive freedom by maintaining policies and practices that routinely remove children from their parents without prior judicial authorization, without meaningful process, and without a genuine emergency requiring immediate state intervention.

263. Defendants further burden that right by separating families without considering whether removal is necessary, whether less-restrictive alternatives are available, or whether the harms of separation outweigh the concerns asserted by BCDSS.

264. Through these policies and practices, defendants unlawfully interfere with the Parent Plaintiffs' right to reproductive freedom without a compelling interest pursued by the least restrictive means in violation of Article 48.

265. Ms. Stocksdale, Mr. Afolabi, Ms. Smith, and Judges Carrión and Blomquist acted with malice or gross negligence, for the reasons stated above. The Parent Plaintiffs and members of the Parents' Class seek damages on this count against those defendants in their personal capacities.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A. Enter an order that plaintiffs may maintain this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or 23(b)(3);

B. Enter judgment declaring unconstitutional and unlawful:

i. Defendants' violation of the Children Plaintiffs' and Children's Class's Fourth Amendment right to be free of unreasonable seizures;

ii. Defendants' violation of plaintiffs' and the classes' Fourteenth Amendment right to procedural due process;

iii. Defendants' violation of plaintiffs' and the classes' Fourteenth Amendment right to substantive due process;

iv. Defendants' violation of the Children Plaintiffs' and Children's Class's right under Article 26 of the Maryland Declaration of Rights to be free of unreasonable seizures;

v. Defendants' violation of plaintiffs' and the classes' right under Article 24 of the Maryland Declaration of Rights to procedural due process;

vi. Defendants' violation of plaintiffs' and the classes' right under Article 24 of the Maryland Declaration of Rights to substantive due process; and

vii. Defendants' violation of Parent Plaintiffs' and the Parents' Class's right under Article 48 of the Maryland Declaration of Rights to reproductive freedom;

C. Provide preliminary and permanent injunctive and other equitable relief adequate to remedy BCDSS's unconstitutional policies and practices of removing children without notice and a hearing absent a genuine emergency, and of keeping them separated unnecessarily;

D. Award compensatory damages to plaintiffs and members of the classes in an amount to be determined;

E. Award punitive damages, in an amount to be determined, to plaintiffs and members of the classes against Ms. Stocksdale and the BCDSS caseworkers Ms. Smith and Mr. Afolabi in their personal capacities;

F. Award plaintiffs and members of the classes their fees and costs, including attorneys' fees, as permitted by law;

G. Award plaintiffs and members of the classes prejudgment and post-judgment interest; and

H. Award plaintiffs and members of the classes such other and further relief as the Court deems just and equitable.

November 23, 2026

Respectfully submitted,

*/s/ Marja Plater*
(signed with permission of Marja Plater)
Marja Plater (#29706)
Kaitlin Banner*
Angela Rambert*
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
700 Fourteenth Street N.W., Suite 400
Washington, D.C. 20005
(202) 319-1000
marja_plater@washlaw.org
kaitlin_banner@washlaw.org
angela_rambert@washlaw.org

Blair Decker†
Carolyn A. DeLone*
Aidan Coleman (#30303)
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
blair.decker@hlc.com
carrie.delone@hlc.com
aidan.coleman@hlc.com

*Attorneys for plaintiffs C.C., R.R., R.H., and the putative children's class*

*/s/ Kevin M. Lamb*

Kevin M. Lamb (#20344)
Daniel S. Volchok†
Derek A. Woodman†
Molly Dillaway†
Andrew Nell†
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
kevin.lamb@wilmerhale.com
daniel.volchok@wilmerhale.com
derek.woodman@wilmerhale.com
molly.dillaway@wilmerhale.com
andrew.nell@wilmerhale.com

Alan E. Schoenfeld*
Sarah M.L. Bender*
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com
sarah.bender@wilmerhale.com

Mairead Ahlbach*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
(213) 443-5300
mairead.ahlbach@wilmerhale.com

Elizabeth Rossi (#19616)
Alexa Richardson†
Kailyn Gaines†
CIVIL RIGHTS CORPS
1601 Connecticut Avenue N.W., Suite 800
Washington, D.C. 20009
(202) 844-4975

elizabeth@civilrightscorps.org
alexa@civilrightscorps.org
kailyn@civilrightscorps.org

*Attorneys for plaintiffs Candace Lovett, Edward Lovett, Regina Roland, and the putative parents' class*

**Pro hac vice* application forthcoming
† Admissions pending